## PEOPLE v GARLAND

1. HOMICIDE—TRIAL—JURY SELECTION—PEREMPTORY CHALLENGES.

A defendant's statutory right to 20 peremptory challenges to the jury at a trial for an offense punishable by death or life imprisonment is to insure the empaneling of an impartial jury; where the defendant is charged with such crimes under separate informations which are tried together, he is not entitled to 20 peremptory challenges for each information (MCLA 768.13).

2. CRIMINAL LAW—TRIAL—CHANGE OF VENUE—UNFAVORABLE PUBLICITY—DISCRETION.

The granting of a change of venue in a criminal case because of unfavorable publicity is within the discretion of the trial court and is exercised according to established principles of law; it may be challenged on appeal only if there is an abuse of discretion manifestly subversive of justice.

3. CRIMINAL LAW—TRIAL—CHANGE OF VENUE—IMPARTIAL JURY—PROCEDURE.

Denial of a defendant's motion for a change of venue in a criminal case was not error where the judge did not rule on the motion before attempting to empanel a jury, the voir dire transcript indicates that while almost everyone had heard of the case, most possessed only a fleeting recollection of the circumstances, and the newspaper coverage was not highly inflammatory or prejudicial but direct and straightforward reporting with little prejudicial editorialization.

4. CRIMINAL LAW—ASSISTANCE OF COUNSEL—MISTAKE OF COUNSEL—FAIR TRIAL.

Defendant's counsel, by offering in evidence a video tape of the defendant taken while he was under the influence of sodium

REFERENCES FOR POINTS IN HEADNOTES

[1] 47 Am Jur 2d, Jury, § 244.
[2, 3] 56 Am Jur, Venue §§ 70, 72.
[4] 7 Am Jur 2d, Attorneys at Law § 170.
[5] 7 Am Jur 2d, Attorneys at Law § 172.
[6] 21 Am Jur 2d, Criminal Law §§ 48, 69.
[7] 53 Am Jur, Trial § 861 *et seq.*

brevital and being questioned by a psychiatrist, did not commit a mistake so serious that it deprived the defendant of a fair trial; defense counsel could have been attempting to seek sympathy for the defendant or to demonstrate his mental condition in support of his insanity defense.

5. CRIMINAL LAW—ASSISTANCE OF COUNSEL—MISTAKE OF COUNSEL— NEW TRIAL.

An appellate court will not ordinarily grant a new trial in a criminal case because of a mistake of counsel unless it appears that the defendant might be acquitted if the mistake were not repeated at the new trial.

6. CRIMINAL LAW—FORENSIC PSYCHIATRIC EXAMINATION—PSYCHIA- TRISTS—TESTIMONY—OBJECTIONS.

It is reversible error to admit into evidence over the defendant's objection testimony by a psychiatrist who has participated in the performance of a forensic psychiatric evaluation of the defendant to determine his competency to stand trial (MCLA 767.27a).

7. JURY—SEQUESTRATION—APPEAL AND ERROR.

The failure of the trial court to sequester the jury *sua sponte* where no motion to sequester was made at the trial will not be considered for the first time on appeal unless a clear injustice has occurred.

Appeal from Recorder's Court of Detroit, Joseph A. Gillis, J. Submitted Division 1 June 13, 1972, at Detroit. (Docket Nos. 13105–13108.) Decided December 7, 1972. Leave to appeal granted, 389 Mich 806.

Arville D. Garland was convicted of second-degree murder and manslaughter. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Michael R. Mueller,* Assistant Prosecuting Attorney, for the people.

*Kraizman & Kraizman,* for defendant on appeal.

Before: V. J. BRENNAN, P. J., and QUINN and O'HARA,* JJ.

V. J. BRENNAN, P. J. Defendant Arville Douglas Garland was charged in the Recorder's Court for the City of Detroit with the killing of four young people, including his daughter. He was specifically charged with murder in the first degree (MCLA 750.316; MSA 28.548) in the deaths of Sandra Garland (his seventeen-year-old daughter), Scott Kabran, and Gregory Walls. He was charged with second-degree murder (MCLA 750.317; MSA 28.549) in the death of Anthony Brown. The four homicides occurred at about 2 a.m. on the morning of May 8, 1970, in an apartment located at 4330 Lincoln Street in the City of Detroit.

These cases were consolidated and tried together before a jury from November 9, 1970, through December 12, 1970. Evidence introduced at trial indicated that the deceased, Sandra Garland, left home on the Sunday preceding the homicides; she left a note stating her intentions to her parents. Defendant virtually went without sleep during the week, working double shifts, and spending the remainder of his time looking for his daughter. He went to the apartment building twice during that week looking for his daughter and became acquainted with the place. He found out through a paid informer that his daughter was living in apartment number 9. At approximately 2 a.m. on May 8, 1970, he went to the apartment house after arming himself with two guns, because, as he testified, he expected resistance.

When he arrived at the apartment house, accompanied by his wife, he immediately went up to apartment 9 on the second floor of the building, burst open the door and went into the apartment. He flashed a flashlight and saw his daughter,

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

Sandra, with Scott Kabran in one bed in the nude; Gregory Walls was also lying in the nude on a cot near them, and Anthony Brown, also in the nude, was sleeping in the next room. Defendant testified further that he pulled out one of his pistols from his waist and delivered a blow to Scott Kabran's head, accidently discharging the pistol into his daughter. His wife Martha screamed, "You killed my baby". Defendant then claims he lost control of himself and proceeded to shoot his daughter several more times and also killed the three young men in the apartment. He then descended to the first floor apartment of Donna Potts where he shot once through the door and forced his way into the apartment; he could not find Donna Potts. Donna Potts was Sandra Garland's girlfriend who Mr. and Mrs. Garland believed to be responsible for what they considered their daughter's waywardness. The defendant then left the building, got into his automobile, and drove to the Vernor police station in the City of Detroit. He told his wife to drive home; he walked into the station and surrendered himself, informing the police officers that he had just killed his daughter and three "hippie friends".

On December 12, 1970, the jury brought in a verdict of second-degree murder (MCLA 750.317; MSA 28.549) in the three cases involving the deaths of Scott Kabran, Gregory Walls, and Anthony Brown; the jury returned a verdict of manslaughter (MCLA 750.321; MSA 28.553) in the case involving the death of Sandra Garland. On December 18, 1970, the court sentenced defendant to prison terms of from 10 to 40 years on the charges of second-degree murder and 10 to 15 years on the charge of manslaughter. Defendant appeals his conviction.

Defendant's first argument is that the trial court erred by failing to allow a sufficient number of peremptory challenges. The right to challenge members of the jury peremptorily is statutory in origin; the relevant Michigan statute provides:

"Any person who is put on trial for an offense punishable by death or imprisonment for life, shall be allowed to challenge peremptorily 20 of the persons drawn to serve as jurors, and no more; and the prosecuting officers on behalf of the people shall be allowed to challenge peremptorily 15 of such persons, and no more. In cases involving 2 or more defendants, who are being jointly tried for such an offense, each of said defendants shall be allowed to challenge peremptorily 20 persons returned as jurors, and no more; and the prosecuting officers on behalf of the people shall be allowed to challenge peremptorily as many times 15 of the persons returned as jurors as there may be defendants being so jointly tried." MCLA 768.13; MSA 28.1036.

The trial court granted the defendant 20 peremptory challenges. The defendant argues that in this case, since he was charged under four separate informations, he should be entitled to 20 peremptory challenges for each information, a total of 80 challenges.

The defendant correctly observes that the only two Michigan cases which even remotely deal with this subject are not on point. Neither *People v Sweeny,* 55 Mich 586 (1885), nor *People v Bloom,* 15 Mich App 463 (1969), deal with cases involving charges under several informations, but rather they deal with different counts within one information.

The purpose of statutes such as the one under consideration is to assure the defendant an impartial jury by permitting him to dismiss jurors with

no explanation or justification. The Legislature has determined that in certain classes of cases, a certain number of such challenges will suffice to insure the defendant an impartial jury. Merely because the defendant is charged under four separate informations, it does not follow that it will be four times as difficult to empanel an impartial jury. We therefore conclude that the trial court granted the defendant the full number of peremptory challenges to which he was entitled by statute.

Defendant's second argument is that the trial court erred by denying defendant's motion for a change in venue, which motion was made two weeks prior to the trial. The defendant argues that all jurors eventually seated had heard of the case. Defendant contends that the extensive newspaper coverage accorded the case displayed the defendant as a man possessed of an outdated moral code and argues that the community in general is hostile to individuals with such a moral code.

After examining copies of the newspaper reports and the transcript of the voir dire examination, we conclude that defendant's argument is not well taken. The trial court did not rule on the defendant's motion before attempting to empanel a jury. An examination of the voir dire transcript indicates that while almost everyone had heard of the case, most individuals possessed only a fleeting recollection of the circumstances. Furthermore the newspaper coverage accorded the incident involved was not highly inflammatory or prejudicial, but direct and straightforward reporting of incidents with little prejudicial editorialization.

This Court's analysis of the venue issue in *People v Jenkins,* 10 Mich App 257, 261–262 (1968), is both concise and thorough. We regard it as dispositive of this issue and set it forth in full:

"The grant of a change of venue is in the discretion of the trial court. This discretion is limited and capable of review where there is an abuse of discretion manifestly subversive of justice. *People v Swift* (1912), 172 Mich 473. Discretion in the trial court is not a private, arbitrary or personal discretion, but must be exercised according to the established principles of law. *People v Gage* (1915), 188 Mich 635. The better rule as to the course of action to be taken where there is a motion for change of venue is reservation of a decision by the trial court on the motion until an attempt has been made to obtain a fair and impartial jury. *People v Dailey* (1967), 6 Mich App 99.

"Jurors who have heard of or have read of the case, without more, are not disqualified as jurors, and their inclusion does not deny defendant a fair trial. See *People v Quimby* (1903), 134 Mich 625; *People v Schneider* (1944), 309 Mich 158; *People v Dailey, supra.* A juror who has formed an opinion may not be challenged for cause, providing the opinion is not positive in character, and he may render an impartial verdict. CL 1948, § 768.10 (Stat Ann 1958 Rev § 28.1033). In this case, all jurors who sat stated that they had no fixed opinion as to the guilt or innocence of the accused and that they could render a fair and impartial verdict.

"Counsel refers us to a decision on due process of law as provided by the 14th Amendment, regarding a fair trial, as binding on our determinations in this matter. It is true that a trial judge may not allow the press to interfere with the course of trial or allow the decision to be based on extraneous publicity. *Sheppard v Maxwell* (1966), 384 US 333 (86 S Ct 1507, 16 L Ed 2d 600). This situation, however, is not alleged to be present in this case. We deal with the problem of prior information and community feeling as affecting a defendant's right to a fair trial. We are referred to and examine in detail the decision of *Irvin v Dowd* (1961), 366 US 717 (81 S Ct 1639, 6 L Ed 2d 751), and regard it as controlling. In American and Anglo-Saxon jurisprudence there is the invaluable right to jury. It must be a panel of impartial jurors. There must be a fair tribunal which renders a verdict on evidence presented at trial for a proceeding to meet the minimum standards of due

process. It is not necessary that they be without impression or opinion. They must, however, be able to lay aside their impressions and base their verdict on the evidence. Where there is strong community feeling and a pattern of deep and bitter prejudice in the community, the influence of that opinion makes a strong impression, nearly impossible to detach from the mental processes of the average man. Trial under such influence denies due process. The burden of showing the existence of these conditions is on the challenger.

"The defense has shown that there were newspaper articles and that some of the jurors had read or heard of the case. This showing, without more, is not sufficient. Defense presents no evidence of a strong community feeling. The trial judge in the community has his senses and personal knowledge of the community to detect this community feeling. An appellate court has only the cold record upon which to rely. There must be a definite, clear showing of abuse of discretion to overturn the trial judge's decision to commence or to acquiesce in the continuance of a trial. Such a showing has not been made in this case either in the denial of a change of venue or in the denial of a continuance."

Defendant's third argument is that the trial court erred by permitting the reception into evidence, and the viewing by the jury, of a video-tape of the defendant while under the influence of a drug. On the tape, Garland was interviewed by a psychiatrist while the former was under the influence of sodium brevital. In response to questions by the psychiatrist, and counsel for the defendant who was also present, the defendant gave details of the shootings.

The defendant now argues that the video-tape presented to the jury a picture of the defendant so totally different from his insanity defense, that he was prejudiced by the admission of the tape. It must be remembered, in discussing this question, that the tape was accepted into evidence on mo-

tion of the defendant's counsel. The question before the court is therefore not the admissibility of a video-tape of a criminal defendant while under the influence of a specific drug, but whether, by seeking the admission of this tape into evidence, defendant's counsel committed a mistake so serious that it deprived the defendant of a fair trial. The standard which the courts have used in considering allegations of this nature was set forth by this Court in *People v Degraffenreid,* 19 Mich App 702, 718, (1969), as follows:

"Ordinarily a new trial will not be granted unless it appears that if a new trial is ordered during the conduct of which the mistake is not repeated the defendant may very well be acquitted."

This writer has had occasion to view the video-tape in question, and to review the record in this case. We do not feel that the defendant's allegation of error meets the standard of review set forth in *Degraffenreid, supra.*

The defendant's testimony that he had no recollection of the incident after his daughter had been shot was reconciled with defendant's statements as presented to the jury on the video-tape. The psychiatrist who conducted the test testified that the drug which was injected into the defendant tends to lower certain mental barriers, and facilitates discussion of otherwise repressed matters. We feel that defendant's counsel could have sought to admit the tape either to gain sympathy for the defendant, or to demonstrate vividly the defendant's mental condition in support of his insanity defense. We do not decide whether such video-tapes are admissible, we only decide that under these circumstances the admission of this tape did not deprive the defendant of a fair trial.

Defendant's fourth argument is that the trial court erred by permitting, over defendant's objection, certain psychiatric testimony regarding the defendant's sanity at the time of the shootings. This testimony was based on tests and observations made while the defendant was committed to a forensic center to determine his competency to stand trial. The statute (MCLA 767.27a; MSA 28.966[11]) which provides for such commitment also provided the basis for defendant's objection; in pertinent part, it states:

"(3) Upon a showing that the defendant may be incompetent to stand trial, the court shall commit the defendant in the criminal case to the custody of the center for forensic psychiatry or to any other diagnostic facility certified by the department of mental health for the performance of forensic psychiatric evaluation. The commitment shall be for a period not to exceed 60 days. Within that period the center or other facility shall prepare a diagnostic report and recommendations which are to be transmitted to the committing court.

"(4) Upon receipt of the diagnostic report and recommendations the sheriff shall immediately return the defendant to the committing court and the court shall immediately hear and determine the issue of competence to stand trial. *The diagnostic report and recommendations shall be admissible as evidence in the hearing, but not for any other purpose in the pending criminal proceedings.*" (Emphasis supplied.)

Defendant argues that the emphasized portion of the statute would bar a psychiatrist from testifying if he had participated in the competency proceeding. The court permitted the doctor to testify and he did base his conclusions to a significant extent on observations made while defendant was committed pursuant to the statute. In fact, the majority of his testimony would only be admissible at a competency hearing, not at a trial.

The admission of the doctor's testimony constitutes reversible error. The Michigan Supreme Court recently stated in *People v Martin,* 386 Mich 407, 425 (1971), reported after the trial in this case, that:

"a psychiatrist who conducts such a forensic psychiatric examination may not be called to testify in the criminal trial if there is an objection to the admission of such testimony by defendant."

Such a practice was also condemned by this Court in *People v Schneider,* 39 Mich App 342 (1972). On this basis, defendant's conviction must be set aside.

Defendant's final argument is that the trial court erred by failing to sequester the jury. The prosecutor points out that defendant's trial attorneys never requested the court to take such an action. This matter not having been raised before the trial court, it will not be considered here unless a clear injustice has occurred. *People v Schram,* 23 Mich App 91 (1970); *People v Ivy,* 11 Mich App 427 (1968). We have read the newspaper coverage of defendant's trial, and the trial court's repeated admonitions to the jury to avoid the publicity the case was receiving, and we do not believe the trial court erred by failing, *sua sponte,* to sequester the jury.

Reversed and remanded.

All concurred.