PEOPLE v STOCKARD

1. Venue—Change of Venue—Discretion.

The grant or refusal of a change of venue is within the sound discretion of the trial court; the trial court's ruling will be reversed only where an abuse of discretion appears.

2. Jury—Pretrial Publicity—Opinions—Prejudice—Challenge.

Exposure of prospective jurors to publicity concerning a case does not automatically require their exclusion from the jury panel; a juror who has formed an opinion may not be challenged for cause, providing the opinion is not positive in character, and he may render an impartial verdict.

3. Jury—Bias—Evidence—Peremptory Challenges.

The fact that defense counsel chose not to exercise all peremptory challenges militates against a defendant's argument of jury bias.

4. Criminal Law—Witnesses—Immunity—Instructions to Jury—Trial Strategy.

It was not reversible error for the trial court and the prosecuting

References for Points in Headnotes

[1] 56 Am Jur, Venue § 72 *et seq.*

[2] 47 Am Jur 2d, Jury §§ 303–305.

[3] 47 Am Jur 2d, Jury §§ 195 *et seq.,* 215, 241, 250–264.

[4] 21 Am Jur 2d, Criminal Law § 146 *et seq.*

[5] 29 Am Jur 2d, Evidence §§ 547, 587, 590.
30 Am Jur 2d, Evidence § 1134.
Voluntariness of confession admitted by court as question for jury. 170 ALR 567.
Constitutional aspects of procedure for determining voluntariness of pretrial confession. 1 ALR3d 1251.
Admissibility of pretrial confession in criminal case—Supreme Court cases. 1 L Ed 2d 1762, s. 4 L Ed 2d 1838, 12 L Ed 2d 1347.

[6] 29 Am Jur 2d, Evidence §§ 614, 620, 641.
Admissibility, as against interest, of declaration of commission of criminal act. 164 ALR 446.
Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1054.

attorney to fail to inform the jury that the leading prosecution witness had received immunity from prosecution for his testimony where defense counsel was informed of the fact prior to the presentation of the witness's testimony and chose not to explore the grant of immunity on cross-examination, failed to request that the jury be instructed as to the witness's immunity, and failed to refer to it in final argument; such conduct appears to have been a deliberate choice of trial strategy.

5. CRIMINAL LAW—EVIDENCE—CONFESSIONS—VOLUNTARINESS—APPEAL AND ERROR.

Voluntariness of an extrajudicial, in-custody, incriminating statement is a question of fact to be initially determined by the trial court on motion to suppress; on review, the court's role is to make an independent determination of the ultimate issue of voluntariness based on an examination of the whole record.

6. CRIMINAL LAW—EVIDENCE—EXTRAJUDICIAL STATEMENTS—ADMISSIBILITY.

The trial court did not err in holding certain of defendant's extrajudicial, in-custody, incriminating statements admissible where defendant was represented by counsel at the time the statements were made, in making the statements defendant acted against the advice of counsel, and defendant acknowledged having been advised of his rights under *Miranda* before each statement.

Appeal from Jackson, Gordon W. Britten, J. Submitted Division 2 June 7, 1973, at Lansing. (Docket No. 13032.) Decided August 27, 1973. Leave to appeal applied for.

Phillip Stockard was convicted of manslaughter. Defendant appeals. Affirmed and sentence modified.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Bruce A. Barton,* Prosecuting Attorney, and *Richard A. Cooley, Jr.,* Assistant Prosecuting Attorney, for the people.

*John B. Phelps,* Assistant State Appellate Defender, for defendant.

Before: Holbrook, P. J., and Danhof and Adams,* JJ.

Danhof, J. Defendant was charged with counts of first- and second-degree murder in the death of William Clark. He was convicted by a jury of manslaughter, MCLA 750.321; MSA 28.553, and was sentenced to a term of 14 to 15 years in prison. He appeals. We affirm, but correct defendant's minimum sentence.

The victim, William Clark, 16 years old, was riding in the front passenger seat of a Volkswagen automobile travelling north on Airline Drive in the City of Jackson on September 13, 1969. As the automobile passed High Street at approximately 9:30 p.m., the driver and the passengers in the back seat heard a "loud pop of the window". Clark had been shot in the head. The driver of the vehicle drove directly to the city police department where officers provided an escort to Foote Hospital. Upon arrival, the victim was pronounced dead.

Approximately 35 witnesses testified at trial. The most damaging evidence against defendant consisted of his own in-custody admissions and the testimony of one Ronald Cotton.

Cotton testified that he and defendant attended a meeting with about 15 other persons in the evening of September 13, 1969. The subject of the meeting was evidently a disturbance involving the police that had occurred at a football game the night before. Cotton, defendant, and 2 others left the meeting. They had guns. According to Cotton, they intended to—

"Well, shoot these guns, you know, out in public, you

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

know, draw the police around, maybe take some shots at police or policeman or something, you know."

Cotton further testified that he was with defendant in the vicinity of Airline Drive at approximately 9:30 p.m. on the night in question; that Cotton was firing a shotgun and defendant was firing a .22-caliber rifle onto the highway at passing vehicles; that there was a Volkswagen among the group of cars shot at and that he (Cotton) saw that someone had been hit.

While in custody, defendant made statements in which he admitted to being in the vicinity in question with Cotton on the night of September 13 and to firing a .22-caliber rifle onto the highway. He stated that he did not intend to shoot anyone, but rather to shoot over cars. He was not aware that anyone had been hit until he had read about it in the newspaper on the following day.

I

Defendant first argues that the trial court erred in failing to grant a change of venue in the face of pretrial publicity and knowledge by prospective jurors of the criminal incident. In his motion for change of venue, defendant alleged the following: defendant had been linked by the media to an organization called the Black Beret; that organization and the killing of Clark, a white youth, had received considerable media coverage; because of hostility in the city and county of Jackson to members of the Black Beret, and racial tension in general, it would be impossible for defendant to receive a fair trial in the county.

Following a hearing, at which several witnesses testified, the motion was denied with the proviso that it could be renewed should the court be

unable to secure a fair and impartial jury. At voir dire, defense counsel challenged for cause all those prospective jurors who had expressed knowledge of the crime or had been exposed to articles about the Black Beret organization. The challenge was denied on the basis of the jurors' statements that each would base his judgment solely on the evidence. Finally a jury was selected after defense counsel had exercised 18 of 20 peremptory challenges.

The grant or refusal of a change of venue is within the sound discretion of the trial court. The burden of proof is on the party seeking the change. The trial court's ruling will be reversed only where an abuse of discretion appears. *People v Swift,* 172 Mich 473; 138 NW 662 (1912), *People v Dailey,* 6 Mich App 99; 148 NW2d 209 (1967). It does not appear that the testimony of defendant's witnesses at the hearing established the impossibility or even improbability of impaneling an impartial jury.

Exposure of prospective jurors to publicity concerning the case does not automatically require their exclusion from the panel. In *People v Jenkins,* 10 Mich App 257, 261; 159 NW2d 225, 228 (1968), it was stated:

"Jurors who have heard of or have read of the case, without more, are not disqualified as jurors, and their inclusion does not deny defendant a fair trial. See *People v Quimby,* 134 Mich 625; 96 NW 1061 (1903); *People v Schneider,* 309 Mich 158; 14 NW2d 819 (1944); *People v Dailey, supra.* A juror who has formed an opinion may not be challenged for cause, providing the opinion is not positive in character, and he may render an impartial verdict."

See also *People v Garland,* 44 Mich App 243; 205 NW2d 195 (1972). Furthermore, the fact that de-

fense counsel chose not to exercise all peremptory challenges militates against defendant's argument of jury bias. *People v Collins,* 43 Mich App 259, 263; 204 NW2d 290, 292 (1972); *People v Greene,* 42 Mich App 154, 155–156; 201 NW2d 664, 665 (1972). We find no abuse of discretion in the trial court's denial of defendant's motion for a change of venue.

## II

Defendant next claims that the exclusive use of voter registration lists in Jackson County for selecting the jury array denied him of a jury composed of a valid cross section of the community. This issue was decided contrary to defendant's position in *People v Robinson,* 41 Mich App 259, 262–263; 199 NW2d 878, 880 (1972). See also *People v Porter,* 46 Mich App 477; 208 NW2d 182 (1973).

## III

Defendant argues that the failure of the prosecuting attorney and the trial court to inform the jury that the leading prosecution witness had received immunity for his testimony constituted a denial of due process of law. However, from the record it appears that defense counsel was aware from the very beginning of the grant of immunity to Ronald Cotton. The preliminary examination of defendant was held in the 13th District Court on the 20th, 21st, and 22nd days of August, 1970. Defense counsel, Charles Brown, was representing defendant at that time as well as throughout the entire trial. On August 21, 1970, the prosecution sought and the circuit court granted immunity to Cotton from any criminal prosecution growing out

of events about which he testified at the examination.

At trial, it was defense counsel who asked that the jury be excused when Cotton was called to the stand. Defense counsel then challenged the competency of the witness to testify on the grounds that he had a record of psychiatric difficulties. The court ruled that the witness's psychiatric record went to the weight of his testimony, and was not grounds for his exclusion. The prosecutor then reminded the court and defense counsel that Cotton had been granted immunity. The trial court acknowledged the earlier order granting immunity and interpreted it to apply to Cotton's trial testimony. The jury was then recalled. Upon cross-examination of Cotton, defense counsel did not choose to explore the grant of immunity, but rather, was more interested in questioning Cotton about a felony charge, arising out of an entirely different incident, pending against him. The prosecutor initially objected, but later withdrew his objection. Defense counsel proceeded to elicit the fact that Cotton had a charge of assault with intent to commit murder pending against him and that he was presently on bond.

The record further reveals that, during a subsequent conference between the court and counsel on proposed jury instructions, there was never any request by defense counsel that the jury be instructed as to Cotton's immunity. Defense counsel did not refer to the grant of immunity in final argument. Counsel's failure to raise the issue of Cotton's possible bias on cross-examination, in final argument, or by way of requested instructions to the jury appears to have been a deliberate choice of trial strategy.

Cases cited by defendant in support of his argu-

ment are clearly distinguishable. In *People v Evans,* 30 Mich App 361; 186 NW2d 365 (1971), Evans's codefendant, Tanner, pled guilty to a lesser offense after giving extremely damaging testimony to both himself and Evans at their joint trial. Evans's counsel requested that the jury be informed that Tanner had pled guilty to a lesser offense. The trial court's refusal to so instruct, or indeed to give any explanation for the fact that Tanner was no longer on trial, was held to be reversible error.

A factual situation parallel to that which prevailed in *Evans, supra,* evolved in *People v Love,* 43 Mich App 608; 204 NW2d 714 (1972). There charges against Rebecca Love, Jesse Love's sister and codefendant, were dismissed just before the trial court delivered its instructions to the jury. Rebecca Love had given the only testimony implicating her brother in an alleged extortion plot. The trial court refused defense counsel's request that the jury be apprised of the fact that charges against Rebecca Love had been dropped upon motion of the prosecutor. The trial court also refused a requested jury instruction to the effect that an accomplice's testimony should be weighed carefully. These two refusals by the trial court were held to constitute reversible error.

In *People v Nettles,* 41 Mich App 215; 199 NW2d 845 (1972), disclosure was made at trial, out of the presence of the jury, that witnesses Kimble and Brown had agreed to testify against defendant Nettles in return for the prosecutor's promise that he would charge them with a lesser offense. But on cross-examination, both witnesses denied receiving any promise for their testimony. Under these facts, this Court held that the prosecutor had an affirmative duty to inform the jury that his wit-

nesses had not been truthful in their statements to defense counsel.

In the case at bar, we hold that adequate disclosure of the immunity granted to witness Cotton in return for his testimony was timely made to defense counsel. Failure by defense counsel to pursue the matter further on cross-examination, in final argument, or by way of requests to instruct convinces us that there was no reversible error.

IV

Defendant contends that certain in-custody admissions were improperly admitted into evidence over objection. These admissions were made at a time when defendant had been charged with armed robbery and was represented in the defense of that charge by attorney Charles A. Nelson. Defendant and Nelson agreed to a polygraph examination of defendant on the armed robbery charge on the condition that the prosecutor would give great weight to the results of the examination in disposing of the charge. The polygraph was set for July 7, 1970, in Lansing. Defendant contends that the examination was nothing but a pretext to secure defendant's confession to the Clark killing. He claims that the police and the prosecutor thus engaged in trickery, in violation of the policy underlying *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). He further contends that all prosecution evidence derived from his initial admissions was tainted under the "fruit of the poisonous tree" doctrine of *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963).

Defense counsel filed a motion to suppress these statements, pursuant to *People v Walker (On Re-*

*hearing)*, 374 Mich 331; 132 NW2d 87 (1965). After hearing evidence and arguments on the motion, the trial court ruled, in an opinion dated June 11, 1971, that defendant's statements had been voluntarily made:

"The defendant was originally placed in custody for armed robbery. After the examination, his Court-appointed counsel was discharged for reasons not revealed to this Court. Thereafter, Attorney Charles Nelson was appointed and, after conferring with the defendant, agreed to a polygraph on the armed robbery charge, only, although he was aware that the police suspected his client knew something about the Clark shooting.

"The defendant went to Lansing with his counsel and after the defendant was advised of his *Miranda* rights and the defendant acknowledged he knew and understood those rights, the operator talked to defendant about his background and family. The operator then started to question the defendant about the robbery. The defendant then volunteered that he knew something about the Clark murder. The operator then informed counsel of this and he in turn, informed the operator that he had told the defendant not to talk about the murder and, if he did so, it was without his consent. This was relayed to the defendant. Defendant's counsel then left for another appointment. Defendant thereafter made exculpatory and incriminatory statements.

"Defendant's counsel returned at lunch time and was advised that defendant had talked about the Clark killing. Counsel then advised defendant—twice—not to make any additional statements, but if he wanted to do so, he was on his own.

"They all returned to the operator's office and the defendant stated the various rights that he knew he was entitled to. A statement was taken. (People's Exhibit 4).

"The defendant was then returned to Jackson and, after some delay to secure a Court reporter and the prosecutor, a statement (People's Exhibit 3) was taken. His *Miranda* rights were again stated and the defend-

ant indicated he understood them. He indicated he wanted to make a statement to the prosecutor.

"Later, while waiting in the holding room, adjacent to the District Court, for his examination, an acquaintance requested to talk to the defendant. The officer granted this request and in reply to a statement by this acquaintance, the defendant made an incriminating statement in the presence of the attending officer.

"The defendant testified that he had taken LSD several times a week for a couple of years as well as other drugs. The jail physician testified that he had given the defendant mild sedatives to help him sleep, insomnia being a common complaint among jail inmates. This sedative had been taken away two days before the trip to Lansing. The doctor made no comment of note on the defendant's mental or physical condition. The defendant was not under the influence of drugs when he made his statements.

"The polygraph officer who questioned defendant knew that the defendant was suspected of knowledge of the Clark shooting, but defendant himself volunteered information on the shooting while being questioned on the armed robbery. The Court found no trickery, duress or deception involved by this officer and defendant was advised of his rights beyond the requirements of *Miranda.*"

Voluntariness is a question of fact to be initially determined by the trial court on motion to suppress. On review, our role is to make an independent determination of the ultimate issue of voluntariness based on an examination of the whole record. *People v Robinson,* 386 Mich 551, 557; 194 NW2d 709, 710–711 (1972). Our examination of the transcript of the *Walker* hearing convinces us that defendant's statements were properly ruled admissible. Defendant was represented by counsel at the time the statements were made. In making the statements, he acted against the advice of counsel. Defendant acknowledged having been advised of his rights under *Miranda* before each statement.

Defendant contends that he understood the *Miranda* warnings to refer to the armed robbery charge only. This contention is belied by the fact that defendant continued to make statements in the presence of his attorney after the polygraph pretest interview when it became perfectly obvious that the police were now pursuing the *Clark* case. Under these facts, we find no error.

## V

Defendant claims that the trial court considered the more serious charges of which defendant was acquitted in aggravation of his sentence. An examination of the sentencing transcript discloses that the trial court's remarks were directed to a reference by defense counsel to a letter defendant had written to the court. The letter apparently complained of jury prejudice. The trial court's observation that defendant could have been convicted of either first- or second-degree murder was made in defense of the jury, not as a justification for an aggravated sentence.

## VI

Lastly, defendant contends that his minimum sentence violates the two-thirds minimum sentence rule as set out in *People v Tanner,* 387 Mich 683; 199 NW2d 202 (1972). We agree. Defendant's appeal was pending as of the date of *Tanner,* and the issue was briefed during the pendency of his appeal. *People v Alvin Reed,* 43 Mich App 556, 558; 204 NW2d 319, 320 (1972). We therefore modify defendant's minimum sentence to ten years.

Affirmed, except as modified herein.

All concurred.