PEOPLE v GARLAND

OPINION·OF THE COURT

See headnote 11.

1. CRIMINAL LAW—COMPETENCY EXAMINATION—PSYCHIATRISTS—EX-
   PERT WITNESSES—ADMISSIBILITY—OBJECTIONS—WAIVER.

   The rationale of a previous Supreme Court decision was that
   waiver of an objection to the statute concerning diagnostic
   report and recommendations of a defendant who may be incom-
   petent to stand trial is a waiver of objection to the testimony of
   the psychiatrists who conducted the forensic psychiatric exami-
   nation; consequently, waiver of the statute waives all (MCLA
   767.27a[4]).

CONCURRING OPINION

T. G. KAVANAGH, LEVIN, and J. W. FITZGERALD, JJ.

2. CRIMINAL LAW—PSYCHIATRISTS—COMPETENCY EXAMINATION—SAN-
   ITY.

   *There is no absolute bar to the psychiatrist who conducts the
   competency examination testifying also on the issue of sanity.*

3. CRIMINAL LAW—INSANITY DEFENSE—EXPERT WITNESSES.

   *A defendant who raises an insanity defense can be required to
   submit to an examination by the people's experts.*

4. CONSTITUTIONAL LAW—FIFTH AMENDMENT—CRIMINAL LAW—EVI-
   DENCE.

   *The Fifth Amendment, which protects an accused person in a
   criminal case from being compelled to be a witness against
   himself, precludes the state from compelling production of
   evidence of a testimonial or communicative nature (US Const,
   Am V).*

REFERENCES FOR POINTS IN HEADNOTES
[1–11] 21 Am Jur 2d, Criminal Law §§ 44, 48, 62–74, 357, 365.
   Investigation of present sanity to determine whether accused
   should be put, or continue, on trial, 142 ALR 961.

5. Constitutional Law—Fifth Amendment—Psychiatrists.

*Communications to a psychiatrist are within the ambit of the Fifth Amendment privilege (US Const, Am V).*

6. Constitutional Law—Self-Incrimination—Criminal Law— States—Employees—Psychiatrists.

*The privilege against self-incrimination, if it means nothing else, most assuredly protects a man against being required to discuss with the employees of the state the details of events which form the basis of the charged offense; answers and other communications solicited by a psychiatrist from a defendant in a criminal case are testimonial and protected by the Fifth Amendment privilege (US Const, Am V).*

7. Constitutional Law—Fifth Amendment—Psychiatric Examina- tion—Waiver.

*Although the Fifth Amendment privilege applies to psychiatric examinations, a competent defendant manifestly can waive the privilege (US Const, Am V).*

8. Constitutional Law—Criminal Law—Insanity Defense—Fifth Amendment—Waiver—Psychiatric Examination—Cross-Ex- amination.

*A defendant who offers psychiatric testimony in support of an insanity defense must be deemed to have waived his Fifth Amendment privilege to the extent of subjecting himself to examination by the people's psychiatrists; any other rule would preclude effective cross-examination of the defendant's psychia- trists, impede the prosecutor in offering effective rebuttal psy- chiatric testimony and would constitute an abuse of the consti- tutional privilege (US Const, Am V).*

9. Constitutional Law—Criminal Law—Psychiatrists—Compe- tency Examination—Sanity.

*There is no constitutional requirement that a psychiatrist, who has learned in the course of an examination to determine competency what he thinks necessary to enable him to testify on sanity, conduct yet another examination or that the state provide yet another doctor to examine the defendant on the sanity issue.*

10. Criminal Law—Statutes—Diagnostic Report—Prejudice— Jury—Sanity—Competency to Stand Trial—District and Prosecuting Attorneys.

*The apparent purpose of the statutory prohibition against the use of the diagnostic report and recommendations is to prevent*

*prejudice possibly resulting if the jury were to learn that the defendant recently had been found competent and were to infer erroneously that he was, therefore, sane at the time the offense was committed; there is no inconsistency between that purpose and conducting only one examination to acquire information on both the issue of competency and the issue of sanity, or between that purpose and allowing the same doctor to testify on both issues; the prosecutor and the people's witnesses should avoid any reference to the competency examination or the results of the examination in the jury's presence (MCLA 767.27a[4]).*

11. CRIMINAL LAW—STATUTES—DIAGNOSTIC REPORT—WAIVER—COMPETENCY EXAMINATION—EVIDENCE.

The statutory bar against admission of the diagnostic report and recommendations, designed for the defendant's protection, is not absolute and this protection may be waived by the defendant if he thinks it advantageous to present evidence from the competency examination to the jury (MCLA 767.27a[4]).

Appeal from Court of Appeals, Division 1, V. J. Brennan, P. J., and Quinn and O'Hara, JJ., reversing and remanding Recorder's Court of Detroit, Joseph A. Gillis, J. Submitted March 13, 1974. (No. 12 March Term 1974, Docket No. 54,677.) Decided December 19, 1974.

44 Mich App 243 reversed.

Arville D. Garland was convicted on three counts of second-degree murder and one count of manslaughter. Defendant appealed to the Court of Appeals. Reversed and remanded. The people appeal. Decision of the Court of Appeals reversed, and convictions affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Michael R. Mueller,* Assistant Prosecuting Attorney, for the people.

*Kraizman & Kraizman,* for defendant on appeal.

WILLIAMS, J. *(to reverse).* I concur in the result reached by my Brother LEVIN but do not agree that the discussion in the introductory matter or Sections I, II, and III of his opinion is necessary to reaching the proper result in this case.

As my Brother LEVIN notes, this Court stated less than three years ago in *People v Martin,* 386 Mich 407, 425; 192 NW2d 215 (1971):

"We conclude that a psychiatrist who conducts such a forensic psychiatric examination may not be called to testify in the criminal trial if there is an objection to the admission of such testimony by defendant."

There is no need to consider whether this is a correct or incorrect interpretation of MCLA 767.27a(4); MSA 28.966(11)(4), inasmuch as in the instant case, as my Brother LEVIN points out, there is a clear waiver of the statute on the record. Defense counsel made specific reference to the Forensic Center competency diagnosis in the questioning of their own expert witness, Dr. Miller. The defense introduced a videotape of defendant's sodium brevital examination at the Forensic Center. The defense introduced into evidence the Forensic Center file.

My Brother LEVIN contends that the waiver of the statute is not a waiver of the testimony of the psychiatrists in question because there is a "separate *Martin*-declared statutory right to prevent" such testimony. The *Martin* rationale is: There is only one statute and one statutory right. There is no "separate *Martin*-declared statutory right".[1] Without the statute there is no right; with the

_____

[1] Of interest is that defendant's brief convincingly argues that the testimony of two psychiatrists in question cannot be disassociated from the statutorily prohibited report.

statute there is no reference to the competency transaction, and this includes reports, recommendations and examining psychiatrist or psychiatrists. As a consequence waiver of the statute waives all.

This finding of statutory waiver resolves this case and obviates the necessity of this Court reviewing the above analysis in *Martin.* I agree fully, therefore, with Section V of Justice LEVIN's opinion on waiver. I would not, however, go further in obiter dicta to discuss aspects of this case involving constitutional issues where there is no necessity to do so.

Accordingly, I concur in my Brother LEVIN's disposition of this case. The Court of Appeals is reversed; the defendant's conviction is affirmed.

T. M. KAVANAGH, C. J., and SWAINSON and M. S. COLEMAN, JJ., concurred with WILLIAMS, J.

LEVIN, J. *(concurring).* Arville Douglas Garland shot and killed his daughter, Sandra, a young man who was in bed with her and two other young men who were sleeping in the same apartment. He was convicted of manslaughter for the death of his daughter and of second-degree murder for the deaths of the three young men.[1]

---

[1] Sandra Garland left home a few days before her death. She explained in a long note to her family her reasons for leaving. A college student, she wanted to be financially independent and live with friends near campus. She expressed love for her family and the belief that she would always be welcome at home.

Her father's frantic search for her began immediately. He worked long hours from late afternoon to early morning and spent his days searching for Sandra. At least twice he visited the apartment house where Sandra was living, but he did not find her.

When his wife failed to persuade Sandra to return home, Garland put two handguns in his belt and a rifle in his car, and proceeded to his daughter's apartment building. A flashlight in hand, he broke down the door of the apartment where Sandra was sleeping. When he saw a young man in bed with her, he drew the gun from his belt

The principal issue at trial was Garland's sanity at the time of the killings.

The Court of Appeals reversed the convictions,[2] on the authority of *People v Martin,* 386 Mich 407, 425; 192 NW2d 215 (1971), because psychiatrists associated with the Center for Forensic Psychiatry, one of whom had examined Garland to determine his competency to stand trial, were permitted to testify on the issue of his sanity.

A statute provides that upon a showing that a defendant may be incompetent to stand trial, the court shall commit him to the forensic center for evaluation, diagnostic report and recommendations. The statute further provides: "The diagnostic report and recommendations shall be admissible as evidence in the hearing [to determine competency to stand trial] but not for any other purpose in the pending criminal proceedings".[3]

In *Martin, supra,* this Court declared in reference to this statute limiting the use of *diagnostic report* and *recommendations:*

"We conclude that *a psychiatrist who conducts such a forensic psychiatric examination may not be called to testify* in the criminal trial if there is an objection to the admission of such testimony by the defendant." (Emphasis supplied.)

The prosecutor appeals claiming "that *Martin* does not hold that psychiatrists from the forensic center who have conducted a psychiatric examination on the defendant pursuant to MCLA 767.27a;

intending, he said, to strike him. Instead, the gun accidentally discharged, killing his daughter. Within minutes, three other people in the apartment had been shot. Garland then sought his daughter's roommate but, unable to find her, he drove to a police station and made a full confession.

[2] *See People v Garland,* 44 Mich App 243; 205 NW2d 195 (1972).

[3] MCLA 767.27a(4); MSA 28.966(11)(4).

MSA 28.966(11) are not allowed to testify at trial as to the issue of the defendant's sanity at the time of the crime" and that the statutory language should be read to prohibit examining psychiatrists from testifying as to guilt or innocence, but not as to sanity.[4]

Garland maintains that, in allowing the forensic center psychiatrists to testify on the issue of sanity, the trial judge derogated both the statutory restriction against use of the "diagnostic report and recommendations" and the constitutional right against self-incrimination which, he contends, the statute is designed to protect.

We all agree that the Court of Appeals should be reversed and the convictions reinstated, but disagree as to the basis of that disposition.

The majority states that they are in accord with the result of this opinion—reversal of the Court of Appeals and affirmance of defendant's convictions —but do not agree that the discussion in Sections I–III of this opinion "is necessary to reach the proper result in this case".

In Part I we address the contentions of the parties revolving around the previously quoted words of the *Martin* opinion, and conclude that this statute, limiting the use of diagnostic report and recommendations, does not—contrary to the

---

[4] The prosecutor's argument is based on the analysis in *United States v Albright,* 388 F2d 719 (CA 4, 1968), quoted in *People v Martin.* If this Court were to address the issues raised by the *Martin* dictum, it could, for all practical purposes, eliminate that dictum by adopting the *Albright* rationale. In Part II we agree with the *Albright* holding but reject its rationale.

The Court of Appeals does not appear to have adopted the distinction proposed by the prosecutor. Garland's conviction was reversed and a new trial ordered because the doctor who examined him on the issue of competency testified at his trial on the issue of sanity. *Similarly, see People v Schneider,* 39 Mich App 342; 197 NW2d 539 (1972). *Cf. People v Alsteens,* 49 Mich App 467, 477; 212 NW2d 243 (1973).

declaration in *Martin*—prohibit a psychiatrist who conducts a competency examination from testifying at trial. In Part III we state that the purpose of the statutory limitation on the use of diagnostic report and recommendations is simply "to prevent prejudice possibly resulting if the jury were to learn that the defendant recently had been found competent and were to infer erroneously that he was, therefore, sane at the time the offense was committed". In Part II we address Garland's self-incrimination claim and conclude that the Fifth Amendment privilege does not bar the psychiatrist who examines to determine competency from testifying at trial on the sanity issue.

The majority states that there is no need to consider whether *Martin* "is a correct or incorrect interpretation" of the statute because "as my Brother LEVIN points out, there is a clear waiver of the statute on the record".

The waiver of the statute which we find in Part V is a waiver of the purpose of the statute declared in Part III, a purpose with which the majority declines to associate themselves.

*If* one reads the statutory purpose as we do (Part III), a defendant who himself brings to the attention of the jury that he was examined and found competent to stand trial cannot properly complain of prosecutorial reference to the competency examination.

As stated in the majority opinion and in Part V, Garland's counsel referred to the competency examination in questioning their own expert witness, introduced a video tape of the sodium brevital examination conducted at the forensic center and introduced into evidence the forensic center file. Garland thereby waived the statutory protection against use of the *diagnostic report* and *recommendations.*

However, *if* a purpose of the statute is, as the *Martin* Court declared, the prohibition of testimony on the issue of sanity by the psychiatrist who examined to determine competency, then merely because a defendant waives the right to prevent the jury from learning that he had been found competent would not constitute a waiver of his separate *Martin*-declared statutory right to prevent the examining psychiatrist from testifying concerning sanity. Waiver of one right does not constitute waiver of the other.

Garland repeatedly objected to the trial court's ruling that the psychiatrist who had conducted the competency examination would be permitted to testify on the issue of sanity. Those objections were voiced both before and during the people's presentation, before the defendant introduced any evidence whatsoever. Those objections cannot properly be construed as a waiver of the statutory purpose declared in *Martin;* the waiver of the Part III-declared purpose occurred during Garland's presentation.

One cannot waive except knowingly and intelligently. We cannot associate ourselves with the conclusion that Garland, who did all that he reasonably could have been expected to do to assert his *Martin*-declared right, waived it "on the record".

And, *if,* as Garland claims, his constitutional right against self-incrimination bars the psychiatrist who examined him to determine competency from testifying on the issue of sanity then, again, merely because he waived his right to complain about the jury learning that he was examined and found competent would not constitute a waiver of his Fifth Amendment right.

For the foregoing reasons, we are of the opinion

that Garland's waiver of the statutory protection against disclosure of the fact of examination and its result, elucidated in Part III, does not dispense with the "need to consider whether this *[Martin]* is a correct or incorrect interpretation" of the statutory limitation. The majority's finding of statutory waiver does indeed "resolve this case" but it does not "obviate the necessity of this Court reviewing the above analysis in *Martin*". To properly resolve this case, it is necessary to decide whether Garland was deprived of the *Martin*-declared and asserted constitutional rights to bar the psychiatrist from testifying on the issue of sanity.

The issue is of continuing importance in the administration of justice. In *People v Schneider,* 39 Mich App 343; 197 NW2d 539 (1972), the Court of Appeals declared, without reference to *Martin,* that a trial court may not permit a psychiatrist who examined to determine competency to be called as a witness at trial: "In this case, once called, the psychiatrist was absolutely barred from basing his opinion to any degree on the report of the center. We cite no authority. None is needed." In the present case the Court of Appeals reversed and ordered a new trial on the authority of *Martin,* stating that the practice of calling at trial the psychiatrist who examined to determine competency "was also condemned by this Court in *People v Schneider*". *People v Garland,* 44 Mich App 243, 253; 205 NW2d 195 (1972).

The Court of Appeals is frequently confronted with claims based on *Schneider* and this Court's declaration in *Martin.*[5] The majority's statement that there is no need to consider whether the *Martin*-declared right is a "correct or incorrect

[5] *See People v Strodder,* 46 Mich App 395, 404; 208 NW2d 187 (1973); *People v Widgren,* 53 Mich App 375, 381; 220 NW2d 130 (1974); *People v Alsteens, supra.*

interpretation" of the statute or to review "the above analysis in *Martin*" will be read as a reassertion of the *Martin*-declared right. In countless trials the people are being put to the expense and inconvenience of calling a second psychiatrist. We believe that this Court should address—for the first time—this important question when, as here, it is properly presented.

# I

The majority states that there is no need to "go further in obiter dicta to discuss aspects of this case involving constitutional issues where there is no necessity to do so". The shoe is really on the other foot. It is the *Martin* Court and the present sitting Court, to the extent it gives continuing running room to *Martin,* that indulges in obiter dicta. The *Martin* declaration was dictum on an issue *neither raised nor argued by the parties nor pertinent to the decision*—Martin's conviction was affirmed.[6]

---

[6] Four psychiatrists testified at Martin's trial.

Dr. Nickel, a local psychiatrist in private practice, testified for the people that on the basis of his examination he believed Martin was sane at the time of the alleged offense.

Martin's counsel then called a Dr. May. He had examined Martin and concluded that he was insane at the time of the alleged offense.

Dr. Tanal, the psychiatrist at the Center for Forensic Psychiatry who had examined Martin for the purpose of determining his competency to stand trial, was called by Martin for cross-examination under the statute. He testified at length on the diagnosis ("schizophrenic reaction") he had made at the forensic center. During his testimony, Martin's counsel moved to have Dr. Robey, whom the prosecutor intended to call for rebuttal, sequestered. That motion was denied. Tanal did not state an opinion concerning Martin's sanity at the time of the alleged offense because, he said, he had examined him solely for the purpose of determining his competency to stand trial.

The people called Robey to define terms used by psychiatrists and to comment on hypotheticals posed by the prosecutor. Robey had not examined Martin at any time. Martin's counsel objected to the failure to indorse Robey on the information. He also contended that Robey's testimony went beyond hypotheticals and focused on the facts of this

The majority's reference to the "analysis in
*Martin*", insofar as it suggests that there was
thoughtful consideration of the issue in *Martin,* is
also incorrect. The *Martin* opinion merely referred
to the statutory limitation on the use of the diag-
nostic report and recommendations and then de-
clared, *without further explanation or any analy-
sis whatsoever* (in the sentence previously quoted
from that opinion) that the psychiatrist who con-
ducts the competency examination "may not be
called to testify in the criminal trial" over objec-
tion.

That declaration manifestly was not commanded
by the language of the statute which limits only
the use of the diagnostic report and recommenda-
tions, not the examination itself.

Garland offered psychiatric testimony in support
of his insanity defense. In that context we would
accept, contrary to *Martin,* the unanimous view of
the United States Courts of Appeals which have
considered the question, that there is no absolute

case. He maintained that Robey became the chief proponent of the
people's view that Martin was sane at the time of the alleged offense.

Martin's brief raised three issues in this Court: "Should Michigan
return to the product of mental disease of *[sic]* mental defect test of
insanity and discard the right-wrong and irresistible impulse tests of
insanity?"; "Were defendant's constitutional rights violated by the
method of transferring defendant from Indiana to Michigan, thereby
depriving Michigan from exercising jurisdiction over him?"; "Did the
trial court commit prejudicial error by overruling defendant's objec-
tions concerning the examination of Dr. Robey?"

Nowhere in his brief did Martin advert to a possible violation of the
statutory prohibition against the use of the diagnostic report and
recommendations for any purpose except in the competency hearing.

It was Martin who called the forensic center psychiatrist who had
conducted the competency examination to testify at trial. That psychi-
atrist did not express an opinion concerning Martin's sanity, whether
over the objection of Martin or his counsel or otherwise, but rather
refused to express an opinion because he had not examined him for
that purpose.

The question of whether the psychiatrist who conducts the compe-
tency examination may testify for the people concerning a defend-
ant's sanity at the time of the alleged offense simply did not arise.

bar to the psychiatrist who conducts the competency examination testifying also on the issue of sanity.[7] The Federal statute reads much like Michigan's.[8] The Federal courts have reasoned that, since a defendant raising an insanity defense can be compelled to submit to a psychiatric examination, no useful purpose would be served by requiring the government to have different psychiatrists examine the defendant separately on the issues of competency and sanity. In reaching that conclusion, the Federal courts have considered the cost of duplicative psychiatric examinations, the problems of trial delay, and the apparent absence of prejudice to defendants.

## II

Most courts agree that there is no constitutional bar to compelling a defendant who raises an insanity defense to submit to a psychiatric examination.[9] Some courts have simply asserted, without

---

[7] *Ruud v United States,* 347 F2d 321 (CA 9, 1965), *cert den,* 382 US 1014; 86 S Ct 624; 15 L Ed 2d 528 (1966); *Birdsell v United States,* 346 F2d 775 (CA 5, 1965), *cert den,* 382 US 963; 86 S Ct 449; 15 L Ed 2d 366 (1965), *reh den,* 383 US 923; 86 S Ct 900; 15 L Ed 2d 680 (1966), and 384 US 914; 86 S Ct 1347; 16 L Ed 2d 368 (1966); *Edmonds v United States,* 106 US App DC 373; 273 F2d 108 (1959), *cert den,* 362 US 977; 80 S Ct 1062; 4 L Ed 2d 1012 (1960); *United States v Mattson,* 469 F2d 1234 (CA 9, 1972).

[8] "No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury." 63 Stat 686 (1949), 18 USC 4244.

[9] 21 Am Jur 2d, Criminal Law, § 365; Anno: *Validity and Construction of Statutes Providing for Psychiatric Examination of Accused to Determine Mental Condition,* 32 ALR2d 434, 444–447. *Contra, see Shepard v Bowe,* 250 Or 288; 442 P2d 238 (1968), citing other cases.

explanation, that the privilege against self-incrimination does not apply to psychiatric examinations.[10] Others have reasoned that the privilege does not apply because evidence of a defendant's mental state is "real" not "testimonial"; like fingerprinting or handwriting, it is nothing more than an exhibition of part of the body.[11]

In *Martin,* this Court ruled that a defendant who raises an insanity defense "must submit himself to examination by the people's experts as ordered by the trial court 'to obtain knowledge not about facts concerning defendant's participation in the criminal acts charged, but about facts concerning a defendant which are themselves material to the case' ".[12] We agree with the *Martin* Court that a defendant who raises an insanity defense can be required to submit to an examination by the people's experts, but disassociate ourselves from the Court's analysis.

The Fifth Amendment, which protects an accused person in a criminal case from being compelled to be a witness against himself, precludes the state from compelling production of evidence of a testimonial or communicative nature.[13]

The scope of the psychiatric examinations in this case, both the examination to determine competency and the sanity examination, demonstrate

[10] *State v Coleman,* 96 W Va 544, 549; 123 SE 580, 582 (1924).

[11] *See State v Grayson,* 239 NC 453, 458; 80 SE2d 387, 390 (1954). *See, also,* 8 Wigmore on Evidence (McNaughton Rev), § 2265, pp 395–399.

[12] This distinction, based on *United States v Albright,* 388 F2d 719, 723 (CA 4, 1968), has been criticized. *See Thornton v Corcoran,* 132 US App DC 232, 237; 407 F2d 695, 700 (1969); Lewin, *Criminal Procedure,* 23 Syracuse L Rev 465, 468 (1972); Note, *Requiring a Criminal Defendant to Submit to a Government Psychiatric Examination: An Invasion of the Privilege Against Self-Incrimination,* 83 Harv L Rev 648, 661, fn 89 (1970).

[13] *Schmerber v California,* 384 US 757, 760–761; 86 S Ct 1826, 1830–1831; 16 L Ed 2d 908, 914 (1966).

that communications to a psychiatrist are within the ambit of the Fifth Amendment privilege. During both examinations, Garland was asked to relate the details of the events giving rise to the offenses charged against him—"facts concerning defendant's participation in the criminal acts charged", not just "facts concerning a defendant which are themselves material to the case".

Information so imparted often reaches the prosecutorial authorities; there is no way to assure that it will not. The privilege against self-incrimination, if it means nothing else, most assuredly protects a man against being required to discuss with employees of the state the details of events which form the basis of the charged offense. We conclude that answers and other communications solicited by a psychiatrist from a defendant in a criminal case are testimonial and protected by the Fifth Amendment privilege.[14]

Although the Fifth Amendment privilege applies to psychiatric examinations, a competent defendant manifestly can waive the privilege.[15] On the same principle that a plaintiff in a personal injury case can be compelled to submit to an examination by the defendant's doctors, a number of courts have ruled that a defendant in a criminal case who gives notice of his intention to call a psychiatric witness in support of a sanity defense can be compelled to submit to an examination by the people's psychiatrists as a precondition to proffering psychiatric testimony at trial.[16]

---

[14] *See People v Ranes,* 13 Mich App 182, 188; 163 NW2d 807 (1968) (T. G. KAVANAGH, J., dissenting); *Thornton v Corcoran, supra; Lee v County Court of Erie County,* 27 NY2d 432, 439; 318 NYS2d 705, 711; 267 NE2d 452, 456 (1971).

[15] *Lee v County Court of Erie County, supra,* p 441.

[16] *See Lee v County Court of Erie County, supra,* p 442; *State v Whitlow,* 45 NJ 3, 24; 210 A2d 763, 774 (1965); *Pope v United States,* 372 F2d 710, 721 (CA 8, 1967), *vacated and remanded on other*

The Fifth Amendment privilege has never been thought to be absolute. A defendant who chooses to testify in his own behalf subjects himself to cross-examination. A defendant who offers psychiatric testimony in support of an insanity defense must, similarly, be deemed to have waived his Fifth Amendment privilege to the extent of subjecting himself to examination by the people's psychiatrists. Any other rule would preclude effective cross-examination of the defendant's psychiatrists, impede the prosecutor in offering effective rebuttal psychiatric testimony and would, accordingly, constitute an abuse of the constitutional privilege.

There is no constitutional requirement that a psychiatrist, who has learned in the course of an examination to determine competency what he thinks necessary to enable him to testify on sanity,[17] conduct yet another examination or that the state provide yet another doctor to examine the defendant on the sanity issue.

## III

The apparent purpose of the statutory prohibition against use of the diagnostic report and recommendations is to prevent prejudice possibly re-

---

*grounds,* 392 US 651; 88 S Ct 2145; 20 L Ed 2d 1317 (1968); *State v Myers,* 220 SC 309, 313; 67 SE2d 506, 508 (1951).

[17] Garland does not claim, nor would the record support a finding, that the state's psychiatrists had insufficient communication with him to form opinions as to his sanity at the time of the alleged killings. "[T]he value of a psychiatrist's testimony depends largely upon his opportunities for observation and the facts he observes." *Rollerson v United States,* 119 US App DC 400, 401; 343 F2d 269, 270 (1964).

Blunt testified that his examination of Garland was extensive, focusing on the time and place of the alleged crime as part of his effort to determine Garland's ability to assist in his own defense. Also, Blunt observed the interview conducted by Robey where the sole issue for consideration was Garland's sanity.

sulting if the jury were to learn that the defendant
recently had been found competent and were to
infer erroneously that he was, therefore, sane at
the time the offense was committed.

There is no inconsistency between that purpose
and conducting only one examination to acquire
information on both the issue of competency and
the issue of sanity, or between that purpose and
allowing the same doctor to testify on both issues.

That purpose could be frustrated, whether one
doctor testifies for the people on both issues or
different doctors testify on the two separate issues,
if a doctor or the prosecutor were to advert to the
competency examination before the jury.

Whether one or two doctors appear for the
people, the essential point is that the prosecutor
and the people's witnesses should avoid any refer-
ence to the competency examination or the results
of the examination in the jury's presence.

IV

The short of it is that in this case the prosecutor
did not offer as evidence or seek otherwise to bring
to the attention of the jurors either the diagnostic
report or the recommendations. Nor were the
report or recommendations the basis of the opin-
ions expressed by the state's psychiatrists concern-
ing Garland's sanity.

Dr. Blunt examined Garland at the forensic
center and wrote the report recommending that he
be found competent to stand trial. Subsequently,
after Garland was found competent and had given
notice of his intended insanity defense, Dr. Robey,
head of the forensic center, examined Garland to
form an opinion concerning his sanity. Also pres-
ent at that examination were Blunt and a Dr.

Miller, Garland's treating physician. Robey had not discussed Garland with Blunt before this examination and only consulted Garland's forensic center file to secure background information gathered by a social worker. After Robey had interviewed Garland and made his own diagnosis, he conferred with Blunt.

Blunt's opinion on sanity was based on his observations during Garland's sanity examination as well as what he learned at the competency examination. There is no allegation that Blunt's testimony was enhanced by anything he learned by conducting the competency examination; the only reasonable inference from the record is that both Blunt and Robey expressed their opinions that Garland was sane at the time of the killings on the basis of the same factual information, information brought out at the sanity examination whether or not it also was brought out earlier at the competency examination.

## V

. While the prosecutor neither offered in evidence nor otherwise sought to apprise the jury of the diagnostic report and recommendations, the jury did learn that Garland had been examined to determine his competency and had been found competent. The defense introduced a videotape of Garland's sodium brevital examination at the forensic center. The jury's attention was again focused on the competency examination when one of Garland's lawyers asked the judge to explain to the jury his objections to the testimony of the psychiatrists associated with the forensic center. Also, a lawyer for Garland had Garland's psychiatrist on redirect examination read the diagnosis contained in the forensic report. The defense intro-

duced as an exhibit the forensic file, specifically the notes taken by Blunt.

The statutory bar against admission of the diagnostic report and recommendations, designed for the defendant's protection, is not absolute. This protection may be waived by the defendant if he thinks it advantageous to present evidence from the competency examination to the jury.

Garland was represented by three experienced criminal defense lawyers. They purposely chose to focus the jury's attention on details of the competency examination. They, no doubt, saw advantages to Garland in that course. We could not properly predicate reversal on the clear and purposeful waiver of the statutory protection.

The Court of Appeals is reversed. The defendant's convictions are reinstated.

T. G. Kavanagh and J. W. Fitzgerald, JJ., concurred with Levin, J.